UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
MICHAEL WILSON,

                         Plaintiff,

                -against-

NEW YORK AND PRESBYTERIAN HOSPITAL
d/b/a NEW YORK-PRESBYTERIAN HOSPITAL,

                         Defendant.
-------------------------------------------------------------------x

**MEMORANDUM AND ORDER**
17-CV-5012 (RRM) (CLP)

ROSLYNN R. MAUSKOPF, United States District Judge.

Plaintiff Michael Wilson brings this action against New York and Presbyterian Hospital d/b/a New York-Presbyterian Hospital ("NYP"), alleging, among other things, retaliation for reporting Fair Labor Standards Act ("FLSA") violations, as defined in 28 U.S.C. § 215(a)(3); retaliation for reporting labor law violations in violation of New York Labor Law ("NYLL") §§ 201-d and 215; and discrimination and retaliation in violation of the New York State Human Rights Law ("NYSHRL"), Executive Law § 296 *et seq*. (Compl. (Doc. No. 1).) Defendants now move for partial summary judgment pursuant to Fed. R. Civ. P. 56. (Notice of Motion (Doc. No. 45).) For the reasons set forth below, Defendants' motion is granted.

## BACKGROUND

Factual Background

Unless otherwise noted, the following facts are not in dispute.[1] Defendant NYP is a hospital and not-for-profit corporation that provides inpatient, ambulatory, and preventative care

---

[1]In answering a motion for summary judgment pursuant to Fed. R. Civ. P. 56, litigants are required by the Local Rules to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record. *See* Local Rule 56.1; *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). "If the opposing party ... fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). These rules are designed to assist the Court by narrowing the scope of the issues to be adjudicated and

in all areas of medicine.  (Defendant's 56.1 Statement of Undisputed Material Facts ("Def.'s SOF") (Doc. No. 46) ¶ 1; Plaintiff's 56.1 Counterstatement of Material Facts ("Pl.'s SOF") (Doc. No. 52) ¶ 1.)  Wilson is a white man, who, at the time the instant motion was filed, was 41 years old.  (Def.'s SOF ¶ 37; Pl.'s SOF ¶ 37.)  Wilson was hired by NYP on or about September 2, 2014, to work as a Projectionist in NYP's Media Services Department.  (Def.'s SOF ¶¶ 2–3; Pl.'s SOF ¶¶ 2–3.)  The Media Services Department is mainly responsible for creating promotional media or internal communications media for NYP, as well as media for training, development, and recognition purposes.  (Def.'s SOF ¶ 4; Pl.'s SOF ¶ 4.)  As a Projectionist, Wilson's job responsibilities included organizing and preparing gear, videotaping or recording events, securing and editing footage to produce final video product, taking still photographs, working on audio-visual presentations, and formatting PowerPoint presentations.  (Def.'s SOF ¶ 79; Pl.'s SOF ¶ 79.)

While Wilson was employed with NYP, he reported to Alan Pine, the Director of Media Services, and Sandra Aldea.  (Def.'s SOF ¶¶ 23, 25; Pl.'s SOF ¶¶ 23, 25.)  Pine is a 67-year-old white man and Aldea is a 50-year-old Puerto Rican woman.  (Def.'s SOF ¶¶ 35–36; Pl.'s SOF ¶¶ 35–36.)  NYP asserts that Aldea was Wilson's direct supervisor and she reported to Pine, though Wilson stated at his deposition that he reported to both Aldea and Pine but Pine was his

---

identifying the facts relevant and admissible to that determination.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) ("The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties.").  Crucially, "[r]ule 56.1 statements are not argument."  *Rodriguez v. Schneider*, No. 95-CV-4083 (RPP), 1999 WL 459813, at *1 (S.D.N.Y. June 29, 1999), *aff'd*, 56 F. App'x 27 (2d Cir. 2003).  Plaintiff's 56.1 Counterstatement of Material Facts ("Pl.'s SOF") (Doc. No. 52) improperly interjects arguments and immaterial facts in response to facts asserted by NYP, without specifically controverting those facts.  This is an inappropriate use of the 56.1 statement that this Court will not credit.  *See, e.g., Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828 (ER), 2013 WL 3929630, at *1 (S.D.N.Y. July 30, 2013) (disregarding "averments in Plaintiffs' Statement that are not denials of the specific facts asserted by Defendant, or not supported by citations to admissible evidence in the record, or that are contradicted by other admissible evidence in the record, or that are improper legal arguments…").  Accordingly, only denials of specific facts, citing to admissible evidence in the record, are deemed disputed, and all other facts are deemed admitted.

direct supervisor until Aldea was promoted.  (Def.'s SOF ¶¶ 24, 28; Pl.'s SOF ¶¶ 24, 28.)  At the time that Wilson was hired, Aldea was the Coordinator of Media Services, but she was promoted to Manager of Media Services on October 1, 2015.  (Def.'s SOF ¶¶ 25–26; Pl.'s SOF ¶¶ 25–26.)  Pine made the decision to hire Wilson; Aldea also interviewed Wilson and recommended he be hired, but did not have the authority to hire or fire employees.  (Def.'s SOF ¶¶ 31–32, 42 10; Pl.'s SOF ¶ 31–32, 42.)  Aldea was responsible for running the day-to-day operations of the department, including but not limited to managing the work environment in the office and assigning work to the video production team, and she had authority to counsel an employee for behaving inappropriately towards another employee.  (Def.'s SOF ¶¶ 40–41, 77–78; Pl.'s SOF ¶¶ 40–41, 77–78.)

Wilson also worked with two Senior Projectionists in the Media Services Department, Robert Sean Stephens and Steve Harris, and the three of them collectively were referred to as the "video production team."  (Def.'s SOF ¶ 33–34; Pl.'s SOF ¶ 3–34.)  Stephens is a 60-year-old white man and Harris is a 66-year-old white man.  (Def.'s SOF ¶ 38–39; Pl.'s SOF ¶ 38–39.)

1. Operating Room Incident

The first and only time that Wilson was involved in a surgery shoot assignment, in late 2014, he was responsible for delivering to the operating room equipment that would be used to film a surgery, but he did not enter the operating room or set up the equipment.  (Def.'s SOF ¶ 10; Pl.'s SOF ¶ 10.)  Wilson was not assigned to film in an operating room because he lacked experience.  (Def.'s SOF ¶ 84–85; Pl.'s SOF ¶ 84–85.)  According to Wilson's deposition testimony, Wilson delivered the equipment to Harris, who was scheduled to film in the operating room, and asked Harris about the "sanitation procedure" for the equipment.  (Pl.'s SOF ¶ 86;

Wilson Affidavit Exhibit 3 ("Wilson Exhibit 3") (Doc. No. 53-3) at 11–13.)[2]  Wilson stated that

Harris told him "not to mention that again especially in front of Al [Pine]."  (Pl.'s SOF ¶ 86;

Wilson Exhibit 3 at 11–13.)  Wilson did not know of any requirement that audiovisual equipment

be sanitized in order to be used in an operating room and has no specific training in sanitizing

equipment to be used in a hospital.  (Def.'s SOF ¶¶ 86–87; Pl.'s SOF ¶¶ 86–87.)  On the day that

this occurred, Wilson did not make a complaint or report this incident to Pine or to any other

manager or supervisor at the hospital.  (Def.'s SOF ¶ 88; *see also* Wilson Exhibit 3 at 14.)

Wilson testified that after this event, Pine called him "Mr. Perfect."  (Wilson Exhibit 3 at 14.)

2.  The Van

During Wilson's employment with NYP, employees in the Media Services Department

occasionally used a van owned by a third-party consultant to travel to assignments.  (Def.'s SOF

¶ 90; Pl.'s SOF ¶ 90.)  The van was insured.  (Def.'s SOF ¶ 91; Pl.'s SOF ¶ 91.)  At some

unspecified time during his employment, Wilson raised an issue regarding one of the van's

mirrors.  (Wilson Exhibit 3 at 23.)  Wilson stated at his deposition that he did not recall Pine or

Aldea telling him not to drive the van after he raised this concern.  (Wilson Exhibit 3 at 23.)

3.  Pine's Comments About Coworkers

At some point, possibly in May 2015, Pine made a comment in which he referred to

Aldea as a "dog," though the exact language is in dispute.  (Pl's SOF ¶ 122; Wilson Exhibit 2,

Deposition of Alan Pine ("Wilson Exhibit 2") (Doc. No. 53-2) at 7–8.)  Wilson asserted at his

deposition that Pine told him to "handle" Aldea "like a dog" and told him that you "can't reason

with a dog."  (Wilson Exhibit 3 at 2–3.)  Wilson further stated that Pine had said Aldea was hot-

headed because she was Puerto Rican.  (*Id*. at 2.)  Pine stated that he "may have said" something

---

[2] Unless otherwise indicated, all page numbers relating to documents filed by defendants refer to numbers assigned to those pages by the Court's Electronic Case Filing ("ECF") system.

about Aldea being Puerto Rican, and suggested that it is "possible" that Puerto Ricans "have a tendency to get hotheaded."  (Wilson Exhibit 2 at 7.)  However, Pine asserted that he said Aldea had "instincts like a dog," meaning that she "has a sense" of when people are "up to no good."  (*Id.*)  On another occasion, according to Wilson's deposition testimony, Pine told Wilson that Harris was "going to meetings" and insinuated that Harris was a sex addict.  (Declaration of Aldriana Kosovych, Exhibit 2 (Doc. No. 50–2) ("Kosovych Exhibit 2") at 37.)  Pine stated at his deposition that he did not remember making such a statement.  (Wilson Exhibit 2 at 8.)

As part of his deposition testimony, Wilson described a day – the date is unclear – when he arrived at the office to pick up some equipment and saw Aldea leaving Pine's office with a "guilty look" on her face and her clothing and hair out of place, which Wilson took to mean that Aldea and Pine were engaged in a sexual relationship.  (Kosovych Exhibit 2 at 30–32.)  Wilson also observed Pine and Aldea having lunch together.  (*Id*. at 31–32.)  Other than these events, Wilson did not observe Pine and Aldea engage in any activity indicating that they had a personal or sexual relationship.  (*Id*. at 31–36.)

It is undisputed that Pine never said anything derogatory to Wilson because of his race, age, or national origin; that Wilson was never the subject of degrading or humiliating comments made by Pine about his race, sex, or gender; and that no manager, officer, hospital executive, or Human Resources personnel ever said anything derogatory to Wilson or created a hostile work environment because of his race, age, national origin, sex, or gender.  (Def.'s SOF ¶¶ 58–64, 66–76; Pl.'s SOF ¶¶ 58–64, 66–76.)

4.   Overtime and Reclassification

At the time Wilson was hired by NYP, he was classified as an exempt employee under the FLSA.  (Def.'s SOF ¶ 117; Pl.'s SOF ¶ 117.)  The parties dispute whether Projectionists in

the Media Services Department had regularly scheduled hours and what those were but agree that Projectionists sometimes worked altered work hours or worked additional time to cover earlier or later jobs.  (Def.'s SOF ¶ 93–95; Pl.'s SOF ¶ 93–95.)  Wilson, like the other Projectionists, had the opportunity to choose to work on assignments that were scheduled in the evening or on weekends.  (Def.'s SOF ¶ 96; Pl.'s SOF ¶ 96.)  Employees in the Media Services Department were able to view future assignments in advance because Aldea entered assignments into the department calendar when she received them.  (Def.'s SOF ¶ 97; Pl.'s SOF ¶ 97.)  The Projectionist job description did not require Wilson to work overtime.  (Def.'s SOF ¶ 98; Pl.'s SOF ¶ 98.)  Wilson was often given the first right of refusal for overtime assignments that he was capable of handling.  (Def.'s SOF ¶ 100; Pl.'s SOF ¶ 100.)  Aldea advised Wilson that if he saw a job on the calendar on an evening or weekend he was available, he could volunteer for the assignment.  (Def.'s SOF ¶ 101; Pl.'s SOF ¶ 101.)

Wilson often advised Aldea in advance that he would be unavailable to work on weekends in the event overtime assignments arose.  (Def.'s SOF ¶ 103; Pl.'s SOF ¶ 103.)  He often refused to work overtime on assignments that were outside of his regular scheduled work hours when such assignments were offered to him, both before and after his job classification changed from exempt to non-exempt.  ((Def.'s SOF ¶ 104; Pl.'s SOF ¶ 104.)  On May 13, 2015, Wilson was offered an assignment over the weekend, but he declined it.  (Def.'s SOF ¶ 106; Pl.'s SOF ¶ 106.)  Wilson advised Aldea that he was unavailable to work on an upcoming weekend or evening shifts on June 16, 2015, and June 30, 2015.  (Def.'s SOF ¶¶ 109–110; Pl.'s SOF ¶¶ 109–110.)

Wilson often requested vacation time and to leave work early for personal commitments. (Def.'s SOF ¶ 105; Pl.'s SOF ¶ 105.)  In May 2015, Wilson asked Aldea for permission to take

two of his accrued vacation days, which she approved.  (Def.'s SOF ¶ 107; Pl.'s SOF ¶ 107.)  On June 9, 2015, Wilson asked Aldea for permission to take a week off for vacation in July 2015, which Aldea approved.  (Def.'s SOF ¶ 108; Pl.'s SOF ¶ 108.)  Wilson also requested permission to leave the office early on two dates in July 2015 and two dates in September 2015 for personal appointments, which Aldea also granted.  (Def.'s SOF ¶¶ 111–112, 114–115; Pl.'s SOF ¶¶ 111–112, 114–115.)  On August 18, 2015, Wilson asked Aldea for permission to take vacation time from August 31 to September 4, 2015, which she also approved.  (Def.'s SOF ¶ 113; Pl.'s SOF ¶ 113.)

On July 15, 2015, Wilson met with Eric Carr, who worked in the Human Resources Department, regarding his supervisor, Aldea, and his interactions with her.  (Def.'s SOF ¶ 118; Pl.'s SOF ¶ 118.)  During this meeting, Wilson claimed that he had been "'getting in trouble' for asking about protocol for being asked to work overtime in the evenings."  (Def.'s SOF ¶ 119; Pl.'s SOF ¶ 119.)

On August 2, 2015, Wilson emailed Carr to ask whether Wilson was FLSA exempt.  (Def.'s SOF ¶ 121; Pl.'s SOF ¶ 121.)  This was the first time that Wilson had explicitly raised the issue of whether he should be classified as exempt.  (Def.'s SOF ¶ 122; Pl.'s SOF ¶ 122.)  On August 3, 2015, Carr responded to Wilson's email stating that he would look into his question, for which Wilson thanked him.  (Def.'s SOF ¶ 123; Pl.'s SOF ¶ 123.)  On August 7, 2015, Wilson sent Carr an email stating that his interactions with Aldea had improved and that his job had become more bearable, and Wilson thanked Carr.  (Def.'s SOF ¶ 124; Pl.'s SOF ¶ 124.)

On October 1, 2015, NYP changed Wilson's job classification from exempt to non-exempt, effective immediately.  (Def.'s SOF ¶ 125; Pl.'s SOF ¶ 125.)  On that same day, NYP also reclassified the jobs of the Senior Projectionists, Stephens and Harris, from exempt to non-

exempt, and retroactively paid them for all overtime worked up to that date.  (Def.'s SOF ¶ 132; Pl.'s SOF ¶ 132.)  NYP provided Wilson with a written notice of his payroll status change in a memorandum from Carr to Wilson entitled "Notice of Change of Employee Status."  (Def.'s SOF ¶ 126; Pl.'s SOF ¶ 126.)  NYP retroactively paid Wilson $6,466.61 for all overtime worked up to that date.  (Def.'s SOF ¶ 127; Pl.'s SOF ¶ 127.)  Wilson was paid in full for every hour he worked overtime, and there was no overtime Wilson worked for which he was not paid.  (Def.'s SOF ¶ 128; Pl.'s SOF ¶ 128.)  On that date, Wilson signed the following written acknowledgement:

> … I acknowledge and agree that the $6,466.61, less withholding, I am being paid for the 122.1 hours of back overtime hours since commencement of my employment with [NY] on September 2, 2014, represents the full amount of wages owed to me, including for all overtime hours worked.  I further acknowledge and agree that I am not owed or otherwise entitled to any additional compensation or remuneration of any kind.

(Def.'s SOF ¶ 129; Pl.'s SOF ¶ 129.)  Wilson also received and signed a Notice and Acknowledgement of Pay Rate and Payday.  (Def.'s SOF ¶ 130; Pl.'s SOF ¶ 130.)  Wilson was "very pleased" with NYP's resolution of his inquiry about his FLSA status and had no complaints about how Human Resources or NYP responded to his inquiry about his status as an FLSA exempt employee or the change in his status to non-exempt.  (Def.'s SOF ¶ 131; Pl.'s SOF ¶ 131.)

After Wilson's job classification changed to non-exempt, he continued to be offered opportunities to cover jobs scheduled in the evening or on the weekend.  (Def.'s SOF ¶ 133; Pl.'s SOF ¶ 133.)  Wilson was offered the same number of off-hours assignments as other members of the video production team after his classification changed from exempt to non-exempt.  (Def.'s SOF ¶ 134; Pl.'s SOF ¶ 134.)  However, Wilson testified at his deposition that he was never allowed to earn overtime pay again.  (Kosovych Exhibit 2 at 44, 46–47.)  He further testified that

8

"after the exemption changed suddenly," his coworkers continued "to work all the nighttime gigs and get paid overtime … for all that work, but I was never again put on any of those gigs… I was not allowed to, at that point, get any overtime work." (*Id*. at 44, 46.)

After Wilson's job reclassification changed on October 1, 2015, Wilson continued to make frequent requests to leave work early and for time off and he continued to turn down off-hours assignments. (Def.'s SOF ¶ 135; Pl.'s SOF ¶ 135.) On December 17, 2015, Aldea asked Wilson to cover a patient holiday party that was scheduled to end at 7:30 p.m., but Wilson refused the assignment. (Def.'s SOF ¶ 136; Pl.'s SOF ¶ 136.) On January 12, 2016, Aldea asked Wilson to cover a three-hour event on a Saturday morning; Wilson again refused this assignment. ((Def.'s SOF ¶ 137; Pl.'s SOF ¶ 137.)

5. <u>Work Performance and Performance Evaluation</u>

Pine counseled Wilson on several occasions regarding service failures that needed to be corrected for Wilson to improve his job performance. (Def.'s SOF ¶ 139; Pl.'s SOF ¶ 139.) Aldea also noted deficiencies in Wilson's work performance and conduct, including that he reacted negatively whenever she asked him what he was working on and, at times, became so confrontational and aggressive that Aldea felt she was being harassed by Wilson. (Def.'s SOF ¶ 140; Pl.'s SOF ¶ 140.)

In the week of June 29, 2015, Aldea asked Wilson to work on certain photos while Harris was on vacation, but told Wilson that if he could not find the photos on the computer, not to worry about it and that Harris would take care of them upon his return. (Def.'s SOF ¶ 143; Pl.'s SOF ¶ 143.) Contrary to Aldea's instruction, when Wilson could not find the photos, he contacted Harris during his vacation. (Def.'s SOF ¶ 144; Pl.'s SOF ¶ 144.)

NYP asserts that Media Services Department policy requires employees to notify their supervisor if they were running late and would arrive to work later than 9:30 a.m. or if they were delayed returning to the office from an assignment.  (Def.'s SOF ¶ 130.)  Wilson disputes that such a policy was enforced against his co-workers.  (Pl.'s SOF ¶ 130; Declaration of Steven Harris ("Harris Dec.") (Doc. No. 54) ¶ 18, 74.)  On Thursday, July 30, 2015, Wilson arrived late for work at 9:43 a.m. and did not call or text to notify anyone that he was going to be late. (Def.'s SOF ¶ 146; Pl.'s SOF ¶ 146.)  The following day, on Friday, July 31, 2015, Wilson failed to report to anyone that he was delayed returning to the office after an assignment at Allen Hospital.  (Def.'s SOF ¶ 147; Pl.'s SOF ¶ 147.)  On August 3, 2015, Pine sent Wilson an email counseling him that he must advise him or Aldea if he was delayed arriving at the office and that he should not disrupt a department member's time off contrary to his supervisor's instructions. (Def.'s SOF ¶ 148; Pl.'s SOF ¶ 148.)

On November 23, 2015, Wilson called Aldea at 2:41 p.m. stating that the job he was working on would end at 3:40 p.m. and requested that Aldea send another projectionist to relieve him so that he could leave at 3:30 p.m. for another commitment he had scheduled.  (Def.'s SOF ¶ 149; Pl.'s SOF ¶ 149.)  When Aldea informed Wilson that Harris was out of the office and Stephens was at another job, and therefore no coverage was available, Wilson simply repeated that he had an appointment and could not stay the additional ten minutes to complete the job. (Def.'s SOF ¶ 150; Pl.'s SOF ¶ 150.)  Because Wilson refused to complete the job, Aldea went to the job location herself to provide coverage until Stephens returned from his assignment and worked overtime to complete the job.  (Def.'s SOF ¶ 151; Pl.'s SOF ¶ 151.)

On January 13, 2016, Wilson spoke to Aldea in a condescending manner and told her to stop talking to him when she counseled him that he should have taken his lunch break earlier in

the day rather than waiting to do so until he was assigned work.  (Def.'s SOF ¶ 152; Pl.'s SOF ¶ 152.)  On January 14, 2016, Wilson was assigned to assist other projectionists and a lighting engineer to set up in the morning for an event scheduled from 9:00–9:30 a.m. at the Wintergarden, followed by a set-up job at a different location at 10:00 a.m. and a headshot at 11:00 a.m. located in the same building as the Wintergarden.  (Def.'s SOF ¶ 153; Pl.'s SOF ¶ 153.)  When Wilson was preparing to leave the Wintergarden to do the set-up job, Aldea directed him to return to the Wintergarden when he finished so that he could continue assisting at the event until he had to leave for the 11:00 a.m. headshot in the same building.  (Def.'s SOF ¶ 154; Pl.'s SOF ¶ 154.)  Contrary to Aldea's directive, Wilson stated that he would not return to the Wintergarden because he had failed to retrieve a camera he needed from the Media Services office earlier that morning.  (Def.'s SOF ¶ 155; Pl.'s SOF ¶ 155.)  When Aldea asked Wilson why he had not retrieved the camera earlier, Wilson simply stated he was busy and walked away. (Def.'s SOF ¶ 156; Pl.'s SOF ¶ 156.)  On January 15, 2016, Wilson disregarded Aldea's instruction by insisting that he should use a higher quality microphone, even though Aldea had already explained that audio quality was not a concern, until Aldea called the client to confirm that the lower quality microphone would suffice.  (Def.'s SOF ¶ 157; Pl.'s SOF ¶ 157.)

On February 17, 2016, Wilson failed to advise Aldea that he had scheduled a meeting with Human Resources personnel and would be away from the office during work hours.  (Def.'s SOF ¶ 159; Pl.'s SOF ¶ 159.)  Aldea verbally warned Wilson regarding his failure to notify Aldea or Pine in advance if he needed to be away from the office during work hours.  (Def.'s SOF ¶ 160; Pl.'s SOF ¶ 136.)  The parties dispute precisely what occurred during that conversation.  According to Aldea and Pine, Wilson became argumentative, reacted aggressively and negatively, and became loud and belligerent, causing Pine to intervene.  (Def.'s SOF ¶ 161;

11

*see also* Declaration of Sandra Aldea ("Aldea Dec.") (Doc. No. 48) ¶ 21; Declaration of Alan

Pine ("Pine Dec.") (Doc. No. 47) ¶ 13.)  Wilson asserts that he had only tentatively scheduled the

meeting and was trying to ask for permission, and that he "calmly and clearly explained" that he

was currently seeking permission to leave for his meeting.  (Wilson Exhibit 3 at 15.)  On

February 19, 2016, Wilson was issued a written warning for his unprofessional, disruptive, and

counter-productive response to the verbal warning and previous direct feedback on multiple

occasions.  (Def.'s SOF ¶ 162; Pl.'s SOF ¶ 162.)

     Wilson received his 2015 performance evaluation on March 3, 2016.  (Def.'s SOF ¶ 163;

Pl.'s SOF ¶ 163.)  This was his first performance evaluation; he did not receive a 2014

evaluation because he had only been employed by NYP for four months of the 2014 review

period.  (Def.'s SOF ¶ 182; Pl.'s SOF ¶ 182.)  Aldea completed the performance evaluation.

(Def.'s SOF ¶ 164; Pl.'s SOF ¶ 164.)  Pine reviewed the evaluation before it was finalized,

agreed with Aldea's ratings and comments, and signed it.  (Def.'s SOF ¶ 165; Pl.'s SOF ¶ 165.)

In Section 1 of his evaluation, titled "NYP Culture," Wilson received a rating of "does not meet

expectations" in 3 out of 5 categories: "Respect – Every Person Counts; Teamwork – Working

Together; and Empathy – Listen, Understand and Respond."  (Def.'s SOF ¶ 167; Pl.'s SOF ¶

167.)  In the Manager's Comments for Section 1, Aldea explained the ratings Wilson received as

follows:

> Michael does not consistently meet my expectations as it relates to NYP's culture
> of respect, teamwork, or empathy.  Although Michael indicates that he wants to
> effectively contribute to the betterment of our department, his behaviors
> demonstrate otherwise.  Anytime Michael is given feedback, he immediately
> becomes argumentative.  He does not listen to the questions being asked with the
> intent to understand and improve.  He very rarely handles differences of opinion
> constructively.  Furthermore, Michael does not demonstrate that he is a team
> player as he generally declines any requests to fill in with working
> weekend/evenings.  We are a very small department so it is important that we
> work closely and support each other to meet the needs of our clients.  If Michael

wants to be successful in his role he will need to learn how to accept feedback and coaching from his supervisor and/or director.  In addition, he will need to learn how to follow directions and how to express himself in a way that is professional and constructive.

(Def.'s SOF ¶ 171; Pl.'s SOF ¶ 171.)

In Section 3a of the evaluation, titled "Core Competencies," Wilson received a rating of "does not meet expectations" in 3 out of 5 categories: "Action Oriented, Integrity & Trust, and Peer Relationships."  (Def.'s SOF ¶ 172; Pl.'s SOF ¶ 172.)  In the Manager's Comments section for Section 3a, Aldea explained the ratings Wilson received as follows:

> Michael is not consistently action oriented.  He generally takes more time than what is normally required to perform routine tasks and doesn't usually take the initiative to do more than what is required.  Examples: for an event that didn't need one hour of set up time, he insisted on having one hour of prep time.  This becomes an issue since it is not always an efficient use of our time as it requires additional time between campuses and therefore reduces our productivity.  For an event located at Presbyterian Hospital building [*sic*], he failed to show up in a timely fashion, citing that he didn't know where the venue was located, even though he had been to that location before.  The department was very upset and couldn't use his services by the time he showed up 30 minutes later.  Michael does not consistently meet my expectations as it relates to integrity and trust.  I find that he struggles with admitting his mistakes, tends to blame others when they are brought to his attention and becomes argumentative when you do not accept his explanation or rationale.  Lastly, Michael demonstrates either an unwillingness to solve problems with minimal disruption or an inability to do so.  For example: when I was his colleague for the majority of 2015, I was expected to coordinate and hand out assignments.  Michael often challenged me, in an unprofessional manner, with regards to his assignment and or department protocol.

(Def.'s SOF ¶ 130; Pl.'s SOF ¶ 130.)

In Section 5 of the 2015 Performance Evaluation titled "Overall Performance Rating," Wilson received an overall rating of "meets expectations."  In the Manager's Comments for Section 5, Aldea wrote:

> Michael is able to perform the technical aspects of his job.  In addition, I have seen him interact with customers and he is always pleasant and professional.  He goes out of his way to make sure they are comfortable in his presence which

allows him to build an environment of trust as it relates to the services he is providing them.  However, I have concerns regarding Michael's overall behavior in the department and this behavior is not acceptable nor does it conform with NYP's values and behaviors.  Unfortunately, Michael's lack of self-awareness and disrespect for authority are going to hinder his ability to be successful at NYP is [*sic*] he is not able to immediately improve his behavior.  I am expecting that in 2016, Michael will better manage his responses to me as it relates to feedback and directives.  I am also expecting that he collaborates more with his colleagues as it relates to assignments, schedules and follow thru [*sic*].

(Def.'s SOF ¶ 178; Pl.'s SOF ¶ 178.)

Wilson wrote a response to his evaluation, expressing disagreement with his supervisors' evaluation of his performance.  (Def.'s SOF ¶ 179; Pl.'s SOF ¶ 179.)  He wrote comments about his evaluation to Emily Davis, Director of the Human Resources Department.  (Def.'s SOF ¶ 180; Pl.'s SOF ¶ 180.)  In his response to his evaluation, Wilson did not state that he would try to meet his supervisors' criticisms or to change his behavior.  (Def.'s SOF ¶ 181; Pl.'s SOF ¶ 181.)

6. April 21, 2016, Incident and Termination

On April 21, 2016, Wilson and Aldea were involved in a verbal altercation after Aldea asked Wilson what he was working on and for an estimate of how long it would take to complete.  (Def.'s SOF ¶ 183; Pl.'s SOF ¶ 183.)  During the argument, after Aldea asked Wilson to stop being aggressive toward her, Wilson told Aldea that Stephens had told Wilson to "be careful around Ms. Aldea because she is always on her period."  (Def.'s SOF ¶ 184; Pl.'s SOF ¶ 184.)  Wilson testified that Stephens made this comment in or around September 2014 and admitted that it was inappropriate to make that comment to his supervisor in April 2016 in response to her criticism of his work performance.  (Def.'s SOF ¶ 185; Pl.'s SOF ¶ 185.) Stephens was also involved in this verbal altercation, and Aldea had to intervene between Wilson and Stephens during the altercation.  (Def.'s SOF ¶¶ 186–87; Pl.'s SOF ¶¶ 186–87.)  Wilson then left the office and went to Human Resources, asking to speak with someone.  (Def.'s SOF ¶ 188;

Pl.'s SOF ¶ 188.)  He met with Chastity Cruz-Hamilton, then Labor Relations Manager, and complained about Stephens's conduct towards him.  (Def.'s SOF ¶ 189; Pl.'s SOF ¶ 189.)

Cruz-Hamilton conducted an investigation into the events of April 21, 2016, which included interviews with Wilson, Stephens, Harris, Aldea, and Pine.  (Def.'s SOF ¶ 190; Pl.'s SOF ¶ 190.)  Cruz-Hamilton's investigation found that Wilson had engaged in disruptive behavior in violation of NYP's Discharge for Cause and Corrective Action Policy and Disruptive Behavior/Behaviors Policy.  (Def.'s SOF ¶ 191; Pl.'s SOF ¶ 191.)  The Discharge for Cause and Corrective Action Policy, which was included in the Employee Handbook and available to Wilson on NYP's "infonet," sets forth a non-exhaustive list of circumstances under which NYP may discharge an employee for cause after an investigation into the employee's conduct, including "engaging in disorderly conduct such as fighting, creating a disturbance, or use of profane or threatening language" and "refusal to follow instructions of supervisors, including refusal to accept legitimate job assignment."  (Def.'s SOF ¶¶ 9–11, 18–19; Pl.'s SOF ¶¶ 9–11, 18–19.)  The Discharge for Cause and Corrective Action Policy also states that the following repeated actions would result in progressive corrective action up to and including termination of employment: unsatisfactory job performance; unsatisfactory attitude or behavior; discourtesy with patients or personnel; absenteeism; lateness; leaving work area without proper permission or before the end of the shift.  (Def.'s SOF ¶ 20; Pl.'s SOF ¶ 20.)  The policy continues, "A single egregious incident of such behavior or violation of an established workplace rule … may result in corrective action up to and including termination of employment …"  (Def.'s SOF ¶ 21; Pl.'s SOF ¶ 21.)  The Disruptive Behavior/Behaviors Policy, which was also available to Wilson in the Employee Handbook and on the infonet, provided in relevant part that "refusing to perform assigned tasks or uncooperative behaviors …" or "behavior that unnecessarily creates a

15

stressful environment… may result in corrective action up to and including termination of employment…."  (Def.'s SOF ¶¶ 9–11, 21–22; Pl.'s SOF ¶¶ 9–11, 21–22.)

After Cruz-Hamilton consulted with Pine regarding the outcome of her investigation, as well as Wilson's prior history of deficient work performance and counseling for inappropriate behavior, Pine recommended to Cruz-Hamilton that NYP terminate Wilson's employment. (Def.'s SOF ¶ 193; Pl.'s SOF ¶ 193.)  NYP's Human Resources Department supported Pine's recommendation that Wilson's employment be terminated.  (Def.'s SOF ¶ 194; Pl.'s SOF ¶ 194.) On April 26, 2016, NYP terminated Wilson's employment, effective that same day; Wilson was advised of his termination in a meeting with Pine and Cruz-Hamilton.  (Def.'s SOF ¶¶ 195–96; Pl.'s SOF ¶¶ 195–96.)

<u>The Complaint</u>

In his Complaint, Wilson sets forth eight causes of action.  Three allege claims under the FLSA or analogous state law for unpaid overtime or failure to provide wage notices throughout his employment; these claims are not at issue here.  (Compl. ¶¶ 99–109, 120–131.)  The remaining causes of action allege various discrimination and retaliation claims.  First, the complaint alleges that NYP violated the NYSHRL, Executive Law § 296(1), by creating a hostile work environment and engaging in "an unlawful pattern and practice of ongoing, continuous, and systematic discrimination" against Wilson, culminating in Wilson's termination.  (*Id*. ¶¶ 152–165.)  Second, the complaint alleges that NYP retaliated against Wilson for reporting sexual harassment and discrimination based on national origin, in violation of New York State Human Rights Law, Executive Law § 296(1).  (*Id*. ¶¶ 166–73.)  Third, the complaint alleges that NYP retaliated against Wilson for reporting his misclassification as exempt, in violation of FLSA provision 29 U.S.C. § 215(a)(3), by refusing to allow him to work overtime after he was

16

reclassified as non-exempt.  (*Id*. ¶¶ 110–19.)  Fourth, the complaint alleges that NYP violated

NYLL § 215 by retaliating against Wilson for reporting violations of state labor law.  (*Id*. ¶¶

132–38.)  Fifth, the complaint alleges that in violation of NYLL § 201-d, NYP retaliated against

him for "engaging in protected workplace activity" and "seeking to improve workplace

conditions."  (*Id*. ¶¶ 139–151.)  Wilson seeks unpaid overtime, $6,005,000 in actual damages, an

unspecified amount of punitive damages, costs, and attorney's fees.  (*Id*. ¶ 173.)

<u>The Instant Motion</u>

NYP now moves for summary judgment with respect to the latter five causes of action.

In its Memorandum of Law, NYP construes Wilson's NYSHRL claim as alleging both hostile

work environment discrimination and also disparate treatment discrimination on the basis of age,

race, sex, and national origin.  (Def.'s Memorandum of Law ("Def.'s Mem.") (Doc. No. 51) at

17–24.)  NYP argues that Wilson has not established a *prima facie* case of discrimination under

NYSHRL because he cannot show that he suffered an adverse employment action or that any

adverse employment action occurred under circumstances giving rise to an inference of

discrimination.  (*Id*. at 17–19.)  Even assuming that Wilson's allegations about his treatment by

Aldea and Pine were true, these stray remarks do not give rise to an inference of discrimination

and do not constitute adverse employment actions because none of them affected Wilson's job

duties or pay.  (*Id*. at 18–19.)  Moreover, NYP argues that it had a legitimate, non-discriminatory

reason for terminating Wilson, namely his poor work performance and inappropriate behavior.

(*Id*. at 19–22.)  NYP also argues that Wilson has failed to show that he was subject to a hostile

work environment, because no evidence supports Wilson's claims and because Wilson himself

admitted that nobody at NYP created a hostile work environment due to his sex, age, or race.

(*Id*. at 22–24.)  Finally, NYP argues that Wilson has failed to establish any element of a *prima*

*facie* retaliation claim under the FLSA, NYLL, or NYSHRL, and that NYP has met its burden of showing a legitimate, non-pretextual reason for Wilson's termination.  (*Id*. at 24–30.)  Finally, NYP argues that Wilson's state law retaliation claims are pre-empted by the National Labor Relations Act ("NLRA").  (*Id*. at 30–31.)

      Wilson's NYSHRL discrimination claim does not specifically identify discrete acts of discrimination, and he does not address NYP's arguments on this point in his Memorandum of Law.  Rather, Wilson argues that his allegations that he caught Stephens watching pornography in the office, that Pine intimated that Harris was a sex addict, and that Pine called Aldea a "dog," taken together, constitute sexual harassment under NYSHRL, and that the record shows that Wilson faced retaliation for reporting it and other incidents.  ((Pl.'s Mem. (Doc. No. 55) at 19–20.)  Specifically, Wilson was formally disciplined on February 19, 2016, just "a few days" after he reported "examples of unlawful discrimination and hostile workplace sexual harassment." (*Id*. at 28.)  Wilson also argues that he was an exemplary employee and the 2015 performance evaluation was part of a "plan put in place to terminate Mr. Wilson with retaliatory animus based on pretext."  (*Id*. at 15–19.)  He further asserts that after he began asking about his classification as exempt, he was denied the opportunity to work overtime, "set up to fail," and that Aldea and Pine both threatened Wilson's job, and therefore Wilson has established a *prima facie* case of retaliation under the FLSA.  (*Id*. at 9–15, 24–26.)  Additionally, Wilson asserts that there is a genuine dispute of material fact regarding whether he faced retaliation for reporting violations of New York Labor Law.  (*Id*. at 20.)  Finally, Wilson alleges that his state law retaliation claims are not pre-empted by the FLSA because the conduct at issue "is of only peripheral concern to the federal law or touches interests deeply rooted in local feeling and responsibility."  (*Id*. at 30, quoting *Helmsley-Spear v. Fishman*, 11 N.Y.3d 470 (2008).)

Wilson also submits an Affidavit.  (Wilson Aff. (Doc. No. 53).)  In his Affidavit, Wilson lists a litany of instances where Aldea and Pine "harassed," "scrutinized," "retaliated" or created an "extremely hostile work environment."  (*Id*.)  He recounts several instances where he was chastised for arriving early or being "on the clock" after he was reclassified to non-exempt, because, he alleges, he was no longer allowed to work more than 40 hours in a given week.  (*See, e.g, id.* ¶¶ 68, 72, 74.)  He also alleges that Wilson caught Stephens watching pornography at work in October 2015 and reported it to Carr but that the incident was never investigated, (*id*. ¶ 109); and alleges that it was "common knowledge" that Pine and Aldea were in a sexual relationship and Aldea may have been the victim of "unwanted sexual harassment," (*id*. ¶ 106).  To substantiate these allegations, Wilson appended 11 exhibits, among them 6 exhibits that are hearsay not within any exception.  These inadmissible exhibits contain emails he sent to Human Resources personnel or notes he allegedly took during his employment at NYP, all raising additional allegations that Aldea and Pine insulted, screamed at, goaded, or harassed Wilson and that they were setting him up to fail and conspiring to get him fired.

Wilson also submits an affidavit from Steven Harris.  (Harris Aff. (Doc. No. 54).)  This affidavit, which includes primarily opinion evidence about Wilson's work performance, conclusorily states that Wilson was subject to "harassment on a daily basis" and a "retaliatory hostile work environment" after Wilson raised the issue of his exempt status with Aldea and Pine.  (Harris Aff. ¶¶ 23–25.)  It also contains hearsay, including a statement that Wilson allegedly told Harris that Pine had said Wilson was "not right for this job" and statements that Pine, on multiple occasions, talked to Harris "about his sexual relationship with Ms. Aldea."  (*Id*. ¶¶ 22, 73.)  The affidavit also states that Wilson volunteered for overtime work "on many occasions."  (*Id*. at 34.)

In reply, NYP argues that the Wilson and Harris Affidavits should both be disregarded by the Court.  (Def.'s Reply (Doc. No. 58) at 5–8.)  NYP asserts that the Wilson Affidavit is impermissible because it is a self-serving affidavit that contradicts Wilson's previous testimony.  (*Id*. at 6–7.)  NYP further argues that the Harris Affidavit is rife with assertions that lack foundation in fact or personal knowledge, making Harris not competent to testify on the matters asserted.  (*Id*. at 7–8.)  NYP also argues that Wilson has abandoned his race, national origin, and age discrimination and hostile work environment claims and that there is no genuine dispute of material fact with respect to those claims.  (*Id*. at 8–9.)  NYP asserts that there is no genuine dispute of fact regarding Wilson's discriminatory termination claims on the basis of race, age, or national origin, though Wilson does not appear to have brought such claims.  (*Id*.)  Further, NYP argues that Wilson has failed to demonstrate a material dispute of fact regarding his retaliation claims, because he fails to refute NYP's showing that his discipline and termination were based on legitimate, non-retaliatory reasons.  (*Id*. at 10–11.)  Finally, NYP argues that Wilson has failed to present evidence that he was engaged in any protected activity under the FLSA, NYSHRL, or NYLL, and has failed to show that he was subjected to any adverse employment action because he engaged in protected activity.  (*Id*. at 11–14.)

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it may impact the "outcome of the suit under the governing law."  *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue of material fact exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed," and the Court must draw all "justifiable" or reasonable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255 (citation omitted); *see also Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) ("[T]he court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions . . . in the light most favorable to the party opposing the motion." (citations omitted)).

Once the moving party has demonstrated that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks omitted); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (collecting cases and stating that the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation"). In other words, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

## DISCUSSION

### I.      NYSHRL Hostile Work Environment Claim

NYSHRL hostile work environment claims are analyzed under the same standard as Title VII hostile work environment claims. *See Russo v. New York & Presbyterian Hosp.*, 972 F. Supp 2d 429, 450–51 (E.D.N.Y. 2013). To establish a NYSHRL "claim predicated on the existence of a hostile work environment, a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Ifill v. United Parcel Serv.*, 2008 WL 2796599 at \*10 (S.D.N.Y. July 17, 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "The environment must be both subjectively and objectively hostile and abusive." *Id.* "Isolated instances of harassment ordinarily do not rise to the necessary level; the employee must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents was sufficiently continuous and concerted, to have altered the condition of his or her working environment." *Id.*

"It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable … only when it occurs because of an employee's … protected characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001); *see also Parekh v. Swissport Cargo Servs., Inc.*, 08-CV-1994 (CPS), 2009 U.S. Dist. LEXIS 8543 at \*4–5 (E.D.N.Y. Feb. 5, 2009) ("Although [t]he incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred, they must occur under circumstances in which the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." (internal quotation marks and citation omitted)). "[C]laims of harassment against those of the opposite gender may 'contribute to the creation of an actionably hostile work environment,' but only 'to the extent' that this conduct 'reveal[s] . . . hostility toward [plaintiff] . . . on account of [his] sex.'" *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 516 (S.D.N.Y. 2010).

Wilson cannot satisfy this burden. First, Wilson admits that no one at the hospital created a hostile work environment on the basis of his sex. (Def.'s SOF ¶ 75; Pl.'s SOF ¶ 75.) Despite this admission, Wilson points to three comments allegedly made in the workplace to support his

claim of sexual harassment: Pine's comment comparing Aldea to a dog and saying she was "hot-headed" because she is Puerto Rican; Pine's comment that Harris "goes to meetings" and was a sex addict; and Stephens's comment that Aldea was "always" on her period.  These comments, though rude, were neither directed at Wilson nor related to his sex.  Additionally, Wilson alleges that Pine and Aldea were engaged in a sexual relationship, as evidenced by the day when he observed Aldea leaving Pine's office with her hair and clothing looking disheveled, but he does not explain how this alleged relationship contributed to a hostile work environment; indeed, Wilson testified at his deposition that he saw no other evidence of this relationship, and he never witnessed Aldea and Pine engage in inappropriate sexual or personal conduct at work.

Finally, Wilson averred in his Affidavit that he saw Stephens watching pornography in the office, and reported it to Carr, but no investigation was ever done.  However, there is no indication that Stephens's alleged viewing of pornography was directed at Wilson; moreover, this incident is not so egregious that it, standing alone, could support Wilson's sexual harassment claim.  *See, e.g., Kimball v. Vill. of Painted Post*, 12-CV-6275 (CJS) (MWP), 2016 U.S. Dist. LEXIS 110846 (W.D.N.Y. Aug. 19, 2016) (one substantiated instance of viewing pornography on a coworker's computer, plus multiple instances of pornography sites minimized on the computer or in the browser history, were not sufficiently severe or pervasive to constitute a hostile work environment); *Dotson v. City of Syracuse*, 04-CV-1388 (NAM) (GJD), 2011 U.S. Dist. LEXIS 20374 at *44–45 (N.D.N.Y. Mar. 2, 2011) ("no reasonable factfinder could conclude" that plaintiff's exposure to pornography at work twice in a six month period was "severe or pervasive to constitute a hostile work environment.").

Accordingly, NYP is entitled to summary judgment with respect to Wilson's NYSHRL hostile work environment claim.

## II.      NLRB Pre-Emption

NYP argues that Wilson's NYSHRL and NYLL retaliation claims are preempted by the National Labor Relations Act ("NLRA").  Under § 7 of the NLRA, employees have the right to engage in "concerted protected activity," and § 8 makes interference with this right an unfair labor practice.  29 U.S.C.S. §§ 157, 158.  The statute does not define "concerted protected activity," but the Supreme Court has long defined the term to include both "the activities of employees who have joined together in order to achieve common goals" and "an individual's assertion of a right grounded in a collective-bargaining agreement."  *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 829, 830 (1984).  When an activity is "arguably subject to § 7 or § 8 of the NLRA, the States as well as the Federal courts must defer to the exclusive competence of the National Labor Relations Board."  *Domnister v. Exclusive Ambulette, Inc.*, 607 F. 3d 84, 89 (2d Cir. 2010) (internal quotations and alterations omitted).  However, where "[p]laintiffs do not claim to be entitled to coverage under any agreement, or to have acted in concert in any fashion," their state law claims are not pre-empted.  *Id*. at 90.

Count Six of the Complaint alleges that Wilson faced retaliation for "engaging in protected concerted activity" and engaging in "legally protected union-like concerted activity pursuant to New York Labor Law § 201-d."  (Compl. ¶¶ 140, 143.)  This claim is pre-empted under the NLRA.

Wilson's NYSHRL retaliation claim and his claim of retaliation under NYLL § 215, however, are not pre-empted.  The NYSHRL claim relates to retaliation Wilson alleges he faced after complaining that he had been subjected to a hostile work environment, and there is no indication that Wilson organized with other employees to address the allegedly hostile work environment that he faced.  Wilson inquired about his own pay and hours, but the record is

devoid of evidence that he organized with the other members of the video production team in order to be reclassified, so his retaliation claim under NYLL § 215 has no relation to concerted protected activity.  Further, there is no evidence that Wilson's employment was covered by a collective-bargaining agreement.  Therefore, Wilson's NYSHRL and NYLL retaliation claims are not pre-empted by the NLRA.

### III.   NYSHRL Retaliation Claims

Retaliation claims under the NYSHRL are evaluated using the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804 (1973). *Summa v. Hofstra Univ.,* 708 F.3d 115, 125 (2d Cir. 2013) ("The burden-shifting framework laid out in *McDonnell Douglas*… governs retaliation claims under both Title VII and the NYSHRL.").  At the first step, the plaintiff must establish a *prima facie* case of retaliation by showing: "(1) [he] engaged in a protected activity; (2) [his] employer was aware of this activity; (3) the employer took adverse employment action against [him]; and (4) a causal connection exists between the alleged adverse action and the protected activity.  *Id.* at 125 (quoting *McDonnell Douglas*, 411 U.S. at 802).   If the plaintiff sustains this initial burden, then, at step two, "the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Id.* (quoting *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)).  At step three, the burden shifts back to the employee to show "'that the employer's action was, in fact, motivated by discriminatory retaliation.'" *Id.* (quoting *Raniola*, 243 F.3d at 625).

"An employee's complaint may qualify as protected activity, satisfying the first element of this test, 'so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated'" the law under which the claim is brought. *Kelly v.*

*Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001)).  A plaintiff's belief on this point is not reasonable simply because he complains about "discrimination in some form" or "general allegations of mistreatment, but must be "directed at something that, as it was alleged, is … properly within the definition of an unlawful employment practice." *Id*. at 15 (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593–94 (2d Cir. 1988) (internal quotation marks omitted)). "As to the second element of the prima facie case, implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by" law. *Id*. at 15.  "To the extent that an employee complains about perceived 'unfair' treatment relating to job responsibility, hiring practices, or corporate policy, but fails to link the treatment to unlawful discrimination or protected status, he fails to establish that he was engaged in protected activity." *Bakeer v. Nippon Cargo Airlines, Co.*, 09-CV-3374, 2011 WL 3625103, at *38 (July 25, 2011), *report and rec. adopted*, 2011 WL 3625083 (E.D.N.Y. Aug. 12, 2011).

Wilson made multiple complaints to Human Resources regarding "harassment" he experienced at the hands of Pine and Aldea, including that he was "set up to fail," but these complaints did not identify this harassment as related to his membership in a protected class. Wilson wrote a rebuttal to his performance evaluation, which he sent to Davis, but did not connect his objections to his performance evaluation to his membership in a protected class. Wilson also complained to Cruz-Hamilton about Stephens's treatment of him after the April 2016 verbal altercation, but nothing in the record suggests that Wilson linked this treatment to

unlawful discrimination or protected status.  Thus, these events do not constitute protected activity under the NYSHRL.

Wilson also asserts that when he told Aldea during the April 2016 verbal altercation that Stephens had cautioned him that Aldea was "always on her period," he was reporting an incident of sexual harassment to his supervisor.  Repeating a sexist insult about a supervisor during an argument with that supervisor cannot reasonably be construed as protected activity, nor could an employer reasonably be expected to interpret Wilson repeating this insult during an argument as opposition to conduct prohibited by the NYSHRL.  Accordingly, Wilson has failed to set forth a *prima facie* case of retaliation under the NYSHRL, and NYP is entitled to summary judgment with respect to the NYSHRL retaliation claim.

## IV.     FLSA and NYLL Retaliation Claims

The FLSA mandates overtime wages for hours worked in excess of 40 hours a week and prohibits employers from discharging or otherwise retaliating against employees who seek enforcement of its provisions.  *See* 29 U.S.C. §§ 207, 215(a)(3).  The NYLL contains analogous provisions.  *See* N.Y. Lab. Law §§ 652, 215.  Retaliation claims brought under the FLSA and NYLL are evaluated using the same *McDonnell Douglas* burden-shifting framework outlined in Section III, above.  *See Mullins v. City of New York*, 626 F. 3d 47, 53 (2d Cir. 2010).

Here, Wilson sets forth evidence from which a reasonable jury could conclude that he was engaged in protected activity when he emailed Carr on August 2, 2015, to inquire about whether he should be classified as an exempt employee. An employee may premise an FLSA or NYLL retaliation claim upon a complaint, whether oral or written, if "the complaint is sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."

27

*Velazquez v. Yoh Servs., LLC*, 803 F. App'x 515, 517 (2d Cir. 2020) (summary order) (quoting *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 107 (2d Cir. 2015) (internal quotation marks omitted)).  It is possible for a plaintiff to state a retaliation claim under the FLSA without proving a violation of the statute.  *Id*. at 517.  Here, Wilson's inquiry, made formally through email communication with Carr on August 2, 2015, was a clear assertion of his rights under the FLSA and NYLL § 215.

However, Wilson fails to show that he was subjected to an adverse employment action. "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).  However, "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006).  "[C]ourts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." *Honey v. County of Rockland*, 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002) (citing *Carter v. N.Y.C. Dep't of Corr.*, 7 F. App'x 99, 103 (2d Cir. 2001) (summary order)).  Further, negative performance evaluations, without an accompanying adverse result, do not constitute adverse employment actions.  *See Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999) (collecting cases).

Wilson asserts he experienced adverse employment actions when he received an email from Pine on August 3, 2015, addressing his recent lateness and failure to follow Aldea's instructions not to contact a coworker during his vacation; a verbal warning on February 17, 2016, regarding failure to warn his supervisors of an anticipated absence during work hours; a

written warning on February 19, 2016, for disruptive behavior; and a negative performance evaluation.  He also asserts that his termination on April 21, 2016, was an adverse employment action.  Of these, neither the email, the verbal or written warnings, nor the negative performance evaluation were accompanied by any negative results such as a change in pay or being placed on probation, and so these are not adverse employment actions.  Additionally, NYP policy states that repeated instances of disruptive or uncooperative behaviors, absenteeism, or lateness "would result in progressive corrective action up to and including termination of employment."  (Def.'s SOF ¶¶ 20–22; Pl.'s SOF ¶¶ 20–22.)  The written and verbal warnings that Wilson received constitute reasonable enforcement of these policies, as does Wilson's termination for cause after the investigation into the April 2016 verbal altercation found that Wilson had violated multiple NYP polices.

In his deposition testimony, Wilson alleges another adverse employment action: he states that he never again was allowed to earn overtime compensation; after his reclassification, his coworkers continued to work all of the evening and weekend jobs whereas he was never permitted to do so.  (Kovalny Exhibit 2 at 44, 46–47.)  In his Affidavit, Wilson offers a slightly different version of events: that he continued to be offered evening and weekend hours, but that his hours each week were capped at 40 hours, such that he was never allowed to earn overtime. (Wilson Aff. ¶¶ 68, 72, 74.)

Wilson cannot defeat NYP's motion for summary judgment "through reliance upon unsupported assertions" that are contradicted by the record.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  The undisputed record shows multiple occasions, both before his reclassification and afterwards, when Wilson was offered evening or weekend jobs and turned them down, as well as multiple occasions when Wilson pre-emptively

stated that he was unavailable for evening or weekend jobs.  No evidence in the record supports

Wilson's assertion that he "never again" was allowed to work evening or weekend jobs.

Moreover, "[a] party may not create an issue of fact by submitting an affidavit in opposition to a

summary judgment motion that, by omission or addition, contradicts the affiant's previous

deposition testimony."  *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996);

*Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 (2d Cir. 1999) (same).  Having previously testified

that he was barred from evening and weekend work, Wilson cannot now submit an affidavit

alleging that he was in fact permitted to work those jobs so long as he never worked more than

40 hours in a given week. Accordingly, Wilson's unsupported allegation that he was forbidden

from working evenings and weekends or ever earning overtime again cannot defeat NYP's

summary judgment motion.

Even assuming that Wilson's termination constituted an adverse employment action, he

fails to demonstrate a causal nexus between this occurrence and his protected activity.

"Although 'temporal proximity can demonstrate a causal nexus,' such proximity must be close."

*Nicastro v. N.Y.C. Dep't of Design & Constr.*, 125 F. App'x 357, 358 (2d Cir. 2005) (summary

order) (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001)).  And where there was "an

intervening causal event that occurred between the protected activity and the allegedly

retaliatory" event, mere temporal proximity between the protected activity and the retaliatory

event is insufficient to support an inference of a causal connection between the two.  *Garcia v.

Yonkers Bd. of Educ.*, 2018 U.S. Dist. LEXIS 142514, at *18 (S.D.N.Y. Aug. 21, 2018)

(collecting cases).  Wilson's termination in April 2016 occurred more than eight months after his

inquiry into his classification.  And, his termination was precipitated by the verbal altercation on

April 21, 2016, in which Wilson repeated a sexist insult he allegedly heard from Stephens.

Wilson therefore fails to meet his burden to raise an inference of retaliation with respect to any adverse employment action.

Because Wilson fails to meet his burden to set forth a *prima facie* case of retaliation under either the FLSA or NYLL, NYP is entitled to summary judgment on these claims.

## CONCLUSION

For the reasons set forth above, NYP's motion for partial summary judgment is granted. This action is recommitted to Magistrate Judge Pollak for all remaining pre-trial matters, including settlement discussions if appropriate.

SO ORDERED.

Dated:   Brooklyn, New York
        June 22, 2021

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge